UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MELANIE GRIFFITHS, individually and on behalf of all others similarly situation,

Plaintiff,

v.

U-HAUL INTERNATIONAL, INC.,

Defendant.

**MEMORANDUM & ORDER**
26-CV-01092 (HG)

**HECTOR GONZALEZ**, United States District Judge:

Plaintiff Melanie Griffiths brings this action against Defendant U-Haul International, Inc. ("U-Haul"), alleging that U-Haul misled customers by using "drip pricing" to institute a hidden "Environmental Fee" on transactions. *See* ECF No. 8 ¶¶ 1–12 (Amended Complaint).[1] Plaintiff brings state law claims for intentional misrepresentation, negligent misrepresentation, unjust enrichment, and violations of New York General Business Law §§ 349, *et seq*. *See id.* ¶¶ 71–123. Defendant has filed a motion to compel arbitration and stay the action, which was fully briefed on July 1, 2026.[2] For the reasons set forth below, the Court GRANTS the motion.

[1] Unless otherwise indicated, when quoting cases and the parties' papers, the Court omits all internal quotation marks, alteration marks, emphases, footnotes, and citations. The Court refers to the pages assigned by the Electronic Case Files system ("ECF").

[2] The motion papers and exhibits consist of: ECF No. 22 (Defendant's Motion to Compel, "Mot."); ECF No. 22-1 (Declaration of Amy Henning, "Henning Decl."); ECF No. 22-2 (2023 Equipment Contract); ECF No. 22-3 (Arbitration Agreement, "AA"); ECF No. 22-4 (Terms and Conditions; "T&Cs"); ECF No. 22-5 (2024 Equipment Contract); ECF No. 23 (Plaintiff's Opposition, "Opp."); ECF No. 23-1 (Checkout Page); ECF No. 23-2 (Declaration of Dr. Yuriy Brun, "Brun Decl."); ECF No. 23-3 (Declaration of Melanie Griffiths, "Griffiths Decl."); ECF No. 23-4 (*Nicosia* Amazon Checkout Screen, "Amazon Checkout Screen"); ECF No. 23-5 (*Meyer* Uber Registration Screen, "Uber Registration Screen"); ECF No. 24 (Defendant's Reply, "Reply").

## BACKGROUND[3]

Plaintiff reserved a rental vehicle on uhaul.com in August 2024. *See* Henning Decl. ¶ 9; Griffiths Decl. ¶ 2.[4] To do so, she completed U-Haul's multi-page online reservation process, which concluded with the "Checkout Page." *See* Checkout Page at 2.[5] The Checkout Page listed the total amount due, followed by fields to fill in shipping and billing information. *See id.* Along the right-hand side of those fields was an optional sign in and notice of U-Haul's "Reservation Guarantee." *See id.*

Below the shipping and billing fields were check boxes for contact preferences and authorized drivers, fields to fill in payment information, and a three-bullet "Order Summary." *See id.* At the bottom of the page, was the total due and the following sentence: "By clicking 'Complete Checkout,' I confirm I have read, understand, and agree to the <u>U-Haul Equipment Reservation Terms and Conditions</u> and the <u>U-Haul Arbitration Agreement</u>." *See id.* (emphasis in original). The sentence hyperlinked the Terms and Conditions ("T&Cs") and the Arbitration Agreement ("AA"). *See* Henning Decl. ¶ 13. The corresponding "Complete Checkout" button immediately followed. *See* Checkout Page at 2. Light grey lines divided topics throughout the page. *See id.* Navigational panes with hyperlinks to various U-Haul webpages were included in the header and footer. *See id.*

---

3 The following facts are drawn from the parties' motion papers and exhibits and construed in the light most favorable to the non-moving party, Plaintiff. Unless otherwise noted, these facts are undisputed.

4 Plaintiff also reserved a U-Haul vehicle in 2023, *see* Henning Decl. ¶¶ 6–7; Griffiths Decl. ¶ 2, but the Court focuses on the 2024 online reservation for purposes of this motion.

5 A copy of the Checkout Page, as filed by Plaintiff, is reproduced as Addendum A.

To submit her reservation and finalize the transaction, Plaintiff had to click the "Complete Checkout" button at the bottom of the page. *See* Henning Decl. ¶ 10. It is not clear whether Plaintiff read the sentence, "By clicking 'Complete Checkout,' I confirm I have read, understand, and agree to the U-Haul Equipment Reservation Terms and Conditions and the U-Haul Arbitration Agreement." But she maintains that she did not notice the hyperlinks in that sentence or click on them. *See* Griffiths Decl. ¶¶ 5–6.

* * *

The Arbitration Agreement states that "any dispute, complaint, controversy, or cause of action arising out of or relating to [Plaintiff's] relationship with U-Haul" shall be arbitrated, not pursued in court. *See* AA §§ 1, 2(a). The AA also delegates to the arbitrator authority to "[r]esolve all disputes regarding the scope and enforceability of this Agreement, including the enforcement of the class action waiver." *Id.* § 7(j)(iv).

The Terms & Conditions expressly incorporate the AA. *See* T&Cs § 1. In bold, uppercase lettering, the T&Cs' first provision states:

> **1. U-HAUL ARBITRATION AGREEMENT**
>
> **CUSTOMER ACKNOWLEDGES AND AGREES THAT THESE TERMS INCLUDE THE U-HAUL ARBITRATION AGREEMENT, AVAILABLE AT UHAUL.COM/LEGAL/ARBITRATION (/LEGAL/ARBITRATION/) AND INCORPORATED HEREIN BY REFERENCE, THAT GOVERNS ANY DISPUTES BETWEEN CUSTOMER AND COMPANY. THIS ARBITRATION AGREEMENT WILL:**
>
> - **ELIMINATE CUSTOMER'S RIGHT TO A JURY TRIAL; AND**
> - **SUBSTANTIALLY AFFECT CUSTOMER'S RIGHTS, INCLUDING PREVENTING CUSTOMER FROM BRINGING, JOINING, OR PARTICIPATING IN CLASS ACTION OR CONSOLIDATED PROCEEDINGS.**

*Id.* The remainder of the T&Cs is primarily written in unbolded, sentence case. *See generally id.*

Nevertheless, Plaintiff maintains that she "did not know that U-Haul had an arbitration agreement" until this litigation. Griffiths Decl. ¶¶ 3–4.

## LEGAL STANDARD

A court deciding a motion to compel arbitration applies "a standard similar to that applicable for a motion for summary judgment." *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017). Summary judgment is appropriate only where "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *see also Meyer*, 868 F.3d at 74 ("[T]he court considers all relevant, admissible evidence submitted by the parties and contained in pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits.").

"On a motion to compel arbitration, the moving party has the initial burden of showing that an agreement to arbitrate exists." *Carvant Fin. LLC v. Autoguard Advantage Corp.*, 958 F. Supp. 2d 390, 395 (E.D.N.Y. 2013). The court must then undertake a two-step inquiry: it "must first determine whether there is a valid agreement to arbitrate between the parties. If there is, the Court must then determine whether the particular dispute falls within the scope of [the] arbitration clause." *Id.* A valid agreement to arbitrate "creates a presumption of arbitrability which is only overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015).

## DISCUSSION

Defendant moves to compel arbitration, contending that Plaintiff agreed to the mandatory arbitration provisions in the T&Cs and AA when she reserved her truck online. *See* Mot. at 6.[6] There is no dispute that Plaintiff clicked the "Complete Checkout" button preceded by the sentence: "By clicking 'Complete Checkout,' I confirm I have read, understand, and agree to the U-Haul Equipment Reservation Terms and Conditions and the U-Haul Arbitration Agreement." *See* Mot. at 8; Opp. at 19. The parties disagree, however, on whether Plaintiff is bound by those terms.

### I. Validity of Agreement to Arbitrate

The threshold question on a motion to compel arbitration is "whether the parties have indeed agreed to arbitrate." *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 118 (2d Cir. 2012). "This question is determined by state contract law." *Meyer*, 868 F.3d at 73–74. "It is a basic tenet of contract law that, in order to be binding, a contract requires a 'meeting of the minds' and 'a manifestation of mutual assent.'" *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) (citing New York law). "The manifestation of mutual assent must be sufficiently definite to assure that the parties are truly in agreement with respect to all material terms." *Id.* at 289. Courts generally "look to the basic elements of the offer and the acceptance to determine whether there was an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Id.*

---

[6] Defendant argues that, in the alternative, Plaintiff assented to the AA on two other occasions: (i) in August 2023, when she signed the U-Haul Equipment Contract for another reservation, and (ii) in August 2024, when she was provided, but did not sign, a copy of the U-Haul Equipment Contract upon picking up the vehicle reserved online. *See* Mot. at 14. The Court need not address this issue because it finds that Plaintiff agreed to arbitrate this action when she reserved her truck online.

Where an offeree lacks *actual* notice of certain contract terms, she is "nevertheless bound by such terms if [s]he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent." *Id.* (emphasis in original). To determine whether an offeree is on inquiry notice of contract terms, courts applying New York contract law consider "whether the term was obvious and whether it was called to the offeree's attention." *Id.* "This often turns on whether the contract terms were presented to the offeree in a clear and conspicuous way." *Id.*

These same contract principles apply to online transactions. *See id.* When evaluating web-based contracts, courts "look to the design and content of the relevant interface to determine if the contract terms were presented to the offeree in way that would put her on inquiry notice of such terms." *Id*. at 289. Courts often find clickwrap agreements, like the one here,[7] which "typically require[] users to click an 'I agree' box after being presented with a list of terms or conditions of use," to provide reasonably conspicuous notice. *See Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016). Requiring a user to "physical[ly] manifest[] assent"—*i.e.*, click the box—is sufficient to put the user on inquiry notice of the terms to which he or she is agreeing. *See Berkson*, 97 F. Supp. 3d at 397; *Soliman v. Subway Franchisee Advertising Fund Trust, Ltd.*, 999 F.3d 828, 837–38 (2d Cir. 2021) (clear language indicating that terms will be

---

[7] Although the parties disagree on the classification of the web-based contract at issue, the Court finds it more akin to a clickwrap agreement than to a browsewrap agreement. *See* Mot. at 16–18; Opp. at 13–16. Clickwrap agreements "require a user to affirmatively click a box on the website acknowledging awareness of and agreement to the terms of service before he or she is allowed to proceed with further utilization of the website." *Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 397 (E.D.N.Y. 2015). On the other hand, "browsewrap agreement[s] [do] not require the user to manifest assent to the terms and conditions expressly . . . [a] party instead gives his assent simply by using the website." *Hines v. Overstock.com, Inc.*, 668 F. Supp. 2d 362, 366–67 (E.D.N.Y. 2009). Here, the customer must click "Complete Checkout" to execute the purchase, which subsequently binds the customer to the T&Cs and AA. *See* Checkout Page at 2.

deemed accepted by clicking a "Complete Checkout" button is sufficient to signal a clickwrap agreement even without an explicit "I Agree" checkbox).

### *A. Reasonably Conspicuous Notice*

Regardless of whether Plaintiff had actual notice of the arbitration provision, determining if she nevertheless had reasonable notice depends on whether the T&Cs and AA were provided to Plaintiff in a clear and conspicuous way. *See Soliman*, 999 F.3d at 834–35. To answer that question for a web-based contract, courts consider "the perspective of a reasonably prudent [] user," *Meyer*, 868 F.3d at 77, and factors like whether: (i) the seller directs the consumer's attention to the hyperlink; (ii) the webpage was muddled with information unrelated to the purchase; (iii) there was any language advising the plaintiff to click on the hyperlinks containing the terms; and (iv) the terms were spatially and temporally coupled with the transaction, *see Rodriguez v. Festival Fun Parks, LLC*, 763 F. Supp. 3d 336, 351–52 (E.D.N.Y. 2025) (citing *Starke*, 913 F.3d at 293; *Meyer*, 868 F.3d at 77–80). The Court finds that the Checkout Page here clearly and conspicuously presented the T&Cs and AA and provided Plaintiff reasonable notice of the arbitration provision.

#### i. <u>Directing User's Attention to Hyperlinks</u>

To start with, U-Haul's Checkout Page clearly directed the customer's attention to the hyperlinks for the T&Cs and AA. *See Rodriguez*, 763 F. Supp. 3d at 351.




The hyperlinks were presented in blue font against a white page and positioned in a standalone sentence directly above the "Complete Checkout" button. *See* Checkout Page at 2.

Regardless of font size, the hyperlinks' presentation and placement rendered them "reasonably conspicuous" to customers. *See Meyer*, 868 F.3d at 78 (reasonable notice provided where, "[a]lthough the sentence is in a small font, the dark print contrasts with the bright white background, and the hyperlinks are in blue and underlined"). That the T&Cs and AA were available on the Checkout Page only as hyperlinks does not preclude a finding of reasonable notice. *See id.*

ii. Not Muddled or Cluttered with Unrelated Content

Next, U-Haul's webpage was not muddled or cluttered with unrelated content to an extent that barred reasonable notice. *Cf. Nicosia*, 834 F.3d at 238 (finding a webpage to be cluttered where it contained many links in several different colors, fonts, and locations as well as other advertisements and promotions). While the Checkout Page contained various information fields, a sign-in option, U-Haul's Reservation Guarantee, and a three-bullet order summary, the page was not so crowded as to distract users from noticing the hyperlinked T&Cs and AA. *See Rodriguez*, 763 F. Supp. 3d at 354. Webpages may include multiple informational fields and still achieve reasonable notice. *See Davitashvili v. Grubhub Inc.*, 131 F.4th 109, 116–117, 117 n.31 (2d Cir. 2025); *Meyer*, 868 F.3d at 78.

Plaintiff argues that the Checkout Page was unreasonably cluttered because there were 154 linked pages, four font colors, fields for the customer's shipping and billing information, and promotional materials. *See* Opp. at 15. As a result, she contends that the T&Cs and AA were "neither obvious nor called to the offeree's attention." *Id.* at 16. This argument, however, is unconvincing for several reasons.

Whether there actually were "154 linked pages," as Plaintiff suggests, is immaterial from "the perspective of a reasonably prudent [] user," *Meyer*, 868 F.3d at 77. Plaintiff determined

that number by running a JavaScript in a browser developer tool, *see* Opp. at 6 n.2, and it is obvious that the lion's share of hyperlinks was in the header and footer of the webpage, not the Checkout portion where a reasonably prudent user's attention was directed. *See* Checkout Page at 2.

As for the "four font colors" Plaintiff mentions: the vast majority of text on the Checkout Page was in similar-sized black font, with eight blue hyperlinks (two of which were the T&Cs and AA) peppered throughout. This is far less distracting than the "at least four font sizes and six colors (blue, yellow, green, red, orange, and black)" on the webpage in *Nicosia*. *See* 834 F.3d at 237 (where "reasonable minds could disagree" whether reasonably conspicuous notice was provided).

And the type and volume of information fields and promotional materials on the Checkout Page were comparable to those on other webpages the Second Circuit considers uncluttered. *See Davitashvili*, 131 F.4th at 116–17, 117 n.31 (webpage sufficiently uncluttered where "the page is less cluttered than the webpage in *Nicosia*"); *Meyer*, 868 F.3d at 77–78 (payment screen sufficiently uncluttered even though it had fields for credit card information, buttons to register for a user account or to connect to the user's pre-existing PayPal account or Google Wallet to the Uber account, and the warning that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"); *contra Starke*, 913 F.3d at 293 (interface "cluttered with diverse text, displayed in multiple colors, sizes and fonts, and feature[d] various buttons and promotional advertisements that distract[ed] the reader from the relevant hyperlink").

The Checkout Page was sufficiently clear and streamlined such that a reasonably prudent user would not be distracted from noticing the T&Cs and AA.[8]

iii. Advisory Language

Continuing to the third factor, U-Haul's webpage clearly advised users to click on the hyperlinks containing the T&Cs and AA. It used unambiguous language that, "By clicking 'Complete Checkout,' I confirm I have read, understand, and agree to the U-Haul Equipment Reservation Terms and Conditions and the U-Haul Arbitration Agreement." *See* Checkout Page at 2 (emphasis in original). This language provided reasonable notice. *See, e.g.*, *Davitashvili*, 131 F.4th at 116 (finding reasonable notice where language warned that, "By placing your order, you agree to Grubhub's terms of use and privacy policy," as it was "a clear prompt directing users to read the Terms and Conditions and signaling that their acceptance of the benefit of registration would be subject to contractual terms"); *Meyer*, 866 F.3d at 78 (finding reasonable notice where language warned that, "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY"); *contra Starke*, 913, F.3d at 293 ("the [] email in no way signals to [plaintiff] that he should click on the link, and it does not advise him that he would be deemed to agree to the contract terms in the document to be found by clicking that link").

---

8 The Court is unpersuaded by Plaintiff's attempt to expand the analysis to additional webpages of the reservation process that she clicked through before reaching the Checkout Page. *See* Opp. at 16. Plaintiff argues that requiring navigation across several webpages induces short-term memory strain and frustration, causing customers to rush through the checkout process without noticing the T&Cs or AA. *See id.* Plaintiff cites no legal authority or other persuasive facts to convince this Court that the act of navigating through several webpages negates the effect of having the contract terms presented in "a clear and conspicuous way" before customers finalize their transactions. *Davitashvili*, 131 F.4th at 116.

iv. Spatial and Temporal Coupling

Finally, the T&Cs and AA were spatially and temporally coupled with the transaction. There was spatial coupling because the T&Cs and the AA were hyperlinked immediately above the "Complete Checkout" button, and a reasonably prudent user could not click "Complete Checkout" without seeing both hyperlinks at the time the reservation was completed. *See* Checkout Page at 2; *see, e.g.*, *Davitashvili*, 131 F.4th at 117 (finding spatial coupling where the Terms and Conditions hyperlink appeared directly below the checkout button); *Meyer*, 868 F.3d at 78 (finding spatial coupling where the Terms of Service & Privacy Policy hyperlink appeared directly below the registration button). And there was temporal coupling because the T&Cs and AA hyperlinks were presented at the time of checkout, so a reasonably prudent user would understand that the agreements were connected to the truck rental reservation transaction. *See* Checkout Page at 2; *Davitashvili*, 131 F.4th at 117 (finding temporal coupling where notice of the Terms and Conditions was presented on the purchase screen, *i.e.*, at the time of purchase); *Meyer*, 868 F.3d at 78–79 (finding temporal coupling where notice of the Terms of Service was provided simultaneously with the user account enrollment).

* * *

In light of these factors, taken together, the Court finds that the Checkout Page provided Plaintiff reasonable notice of the arbitration provision. *See Edmundson v. Klarna, Inc.*, 85 F.4th 695, 707 (2d Cir. 2003) (courts must look at the "totality of the circumstances to determine whether notice was reasonably conspicuous").

*B. Manifestation of Assent*

In determining whether a user manifested assent to a web-based contract, courts consider whether a reasonably prudent user would have understood that by clicking a button

acknowledging awareness, they were agreeing to the stated terms. *See, e.g.*, *Edmundson*, 85 F.4th at 707–08. When terms are conspicuously placed and a user takes an affirmative action, like clicking a "Complete Checkout" button, the user has assented to the terms. *See id.* (holding that clicking a button titled, "Confirm and continue," constitutes assent to hyperlinked terms and conditions immediately preceding the button in a sentence stating, "I agree to the payment terms") (emphasis in original).

Here, to complete the transaction, Plaintiff had to click the "Complete Checkout" button immediately below the hyperlinked T&Cs and AA. *See* Checkout Page at 2.




As discussed above, a reasonably prudent user would notice the hyperlinked T&Cs and AA. *See supra* Section I.A.ii. And a reasonably prudent user would understand that clicking a button labeled "Complete Checkout," immediately preceded by a sentence stating, "By clicking 'Complete Checkout,' *I confirm I have read, understand, and agree* to the [T&Cs and AA]," constitutes assent to the terms contained in those documents. *See* Checkout Page at 2 (emphasis added).

Accordingly, the Court finds that Plaintiff manifested assent to the T&Cs and AA by clicking the "Complete Checkout" button on the Checkout Page. No reasonably prudent internet user could have read the obvious statement, "By clicking 'Complete Checkout,' I confirm I have read, understand, and agree to the U-Haul Equipment Reservation Terms and Conditions and the U-Haul Arbitration Agreement," and clicked the "Complete Checkout" button immediately below, without recognizing that doing so would denote their agreement to the T&Cs and the AA.

*See* Checkout Page at 2 (emphasis in original); *see also Edmundson*, 85 F.4th at 708 ( "it would be unreasonable for an internet user to read the conspicuous and clear statement, 'I agree to the payment terms,' with the button marked 'Confirm and continue' directly below it, and not understand that the 'Confirm and continue' button is the [confirmation] mechanism") (emphasis in original).

**II. Scope of Agreement to Arbitrate**

Turning to the second question of the analysis—the AA's scope—the Court finds that Plaintiff's claims fall within the AA's scope of authority delegated to the arbitrator. Plaintiff concedes this. *See* Opp. at 9 n.5. "When the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract pursuant to §§ 2, 3, and 4 of the [Federal Arbitration Act], unless [Plaintiffs] challenged the delegation provision specifically." *Davitashvili*, 131 F.4th at 118 (citing *Harry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019); *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 72 (2010)).

Here, the AA grants the arbitrator the authority to "[r]esolve all disputes regarding the scope and enforceability of this Agreement, including the enforcement of the class action waiver[.]" AA § 7(j)(iv); *see also* Opp. at 9 n.5 (conceding that "if this Court finds that the arbitration agreement is enforceable . . . then [Plaintiff's] claims fall within the scope of that agreement."). The Court will not interfere with the parties' decision to direct any questions of scope to the arbitrator.

**III. The Court Will Stay This Action**

In light of the enforceability of the arbitration provisions, and as both parties concede, *see* Mot. at 20; Opp. at 9, this action shall be stayed until arbitration is completed in accordance with

the terms of the AA. *See* 9 U.S.C. § 3 (requiring stay where the dispute at issue is subject to an enforceable arbitration agreement); *see also, e.g.*, *Katz v. Cellco P'ship*, 794 F.3d 341, 343 (2d Cir. 2015) (holding that the FAA "requires a stay of proceedings when all claims are referred to arbitration and a stay is requested").

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Compel Arbitration, ECF No. 22, is GRANTED and the action is STAYED until arbitration has concluded. The Court, for administrative convenience only, administratively closes this case until the stay is lifted.

SO ORDERED.

*/s/ Hector Gonzalez*
HECTOR GONZALEZ
United States District Judge

Dated: Brooklyn, New York
August 11, 2026